**UNITED STATES of America ex rel. Robert HUDSON, Petitioner-Appellant,**

v.

**David H. BRIERTON, Warden, Stateville Corrections Center, Respondent-Appellee.**

No. 81–2444.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 4, 1982.

Decided Feb. 4, 1983.

Eugene R. Wedoff, Jenner & Block, Chicago, Ill., for petitioner-appellant.

Michael Vujovich, Asst. Atty. Gen., Springfield, Ill., for respondent-appellee.

Before WOOD, ESCHBACH, and POSNER, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

This is the third appeal in this habeas corpus case.[1] We are required on this appeal to determine: (1) whether noncompliance with a state contemporaneous-objection rule renders unavailable federal habeas review of a state prisoner's claim that the fruits of an allegedly illegal interrogation were admitted at his trial, and (2) whether an in-court identification of the defendant was tainted by suggestive police identification procedures, creating a substantial likelihood of irreparable misidentification. Jurisdiction is based upon 28 U.S.C. § 1291.

Robert Hudson's petition for habeas corpus arises out of his Illinois state court conviction, in 1967, for armed robbery and murder.[2] Hudson challenges the procedures which the Chicago police used to obtain his statements implicating an accomplice, McFadden, who implicated a second accomplice, Smith; both accomplices returned the favor by testifying against Hudson at his trial.[3] Hudson contends that the interrogation violated his Fifth and Sixth Amendment rights because his interrogators did not advise him of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and did not permit him to call an attorney despite his specific request to do so. Furthermore, Hudson asserts that his prolonged interrogation under coercive circumstances rendered his statements involuntary. In addition, Hudson challenges the admission of an in-court identification as unreliable. According to Hudson, the identification procedure was so suggestive as to create a substantial likelihood of irreparable misidentification, yet the identification was admitted at trial, violating his due process rights.

### I. Fruit of the Poisonous Tree; Waiver

Before considering the merits of Hudson's claim respecting the illegality of his interrogation and inadmissibility of the fruits of that interrogation, the district court considered whether Hudson could raise the issue for habeas review since he violated the Illinois contemporaneous-objection rule, making no objection to the admis-

---

1. *United States ex rel. Hudson v. Brierton,* 582 F.2d 1285 (7th Cir.1978) (unpublished); *United States ex rel. Hudson v. Cannon,* 529 F.2d 890 (7th Cir.1976).

   The first appeal was from the district court's dismissal of Robert Hudson's habeas corpus petition for failure to state a claim on which relief could be granted. In *Hudson* I, we concluded "that petitioner's allegations were sufficient to entitle him to a hearing to establish either that his statement was made involuntarily or that he was deprived of his Sixth Amendment right to counsel under *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and that the testimony of his accomplices was 'tainted fruit' of either of these violations." *United States ex rel. Hudson v. Cannon,* 529 F.2d 890, 892. On remand, the district court found that the admission of the "poisonous fruit" was harmless error. However, instead of conducting a hearing, the district court relied on evidence contained in the state court record which was not available when the habeas corpus petition was first filed. The district court also relied on the transcript of the state court trial in deciding the petitioner's new claim, added on remand, that the identification testimony was improperly admitted. The court concluded that the bystander identifications had sufficient indicia of reliability to be admissible.

   On July 14, 1978, this court issued an unpublished order, *Hudson* II, reversing in part, affirming in part, and remanding to the district court for an evidentiary hearing to give Hudson the opportunity to demonstrate that the use of the poisonous fruit violated his constitutional rights. *Hudson* II directed the district court to consider the affect of *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), and *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Additionally, *Hudson* II directed the district court to hold further proceedings with respect to Hudson's claim of irreparable misidentification.

2. Hudson was originally tried by a jury in the Circuit Court of Cook County, Illinois on charges of murder and armed robbery. The jury was unable to reach a verdict. At Hudson's second trial, however, a jury found him guilty of both crimes and he was sentenced to death. On direct appeal to the Illinois Supreme Court, his conviction was affirmed, but the death sentence was vacated and replaced by a prison sentence from 100 to 199 years. *People v. Hudson,* 46 Ill.2d 177, 263 N.E.2d 473 (1970).

3. McFadden and Smith testified at the second trial only, not at the earlier trial which did not produce a verdict.

sibility of the testimony at trial. The district court concluded that the requirements of "cause" and "prejudice" under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)·had been satisfied, thus permitting the issue to be raised for habeas corpus review. As "cause" for failing to raise the issue at trial, the district court cited the unsettled state of the law regarding the scope of the fruit of the poisonous tree doctrine at the time and misfeasance of his attorney.[4] The respondent challenges this ruling. Because we agree with the respondent's position on the waiver issue, we do not reach the merits of Hudson's claim.

In *Wainwright v. Sykes,* the United States Supreme Court granted certiorari to consider the availability of federal habeas corpus to review a state prisoner's claim that testimony was admitted at his trial in violation of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); the state court had previously declined to consider the claim on the merits because Sykes had not complied with the state's contemporaneous-objection rule. Thus, stated generally, the Court was assessing the adequacy of this independent state procedural ground as a bar to federal habeas review. Construing the language of 28 U.S.C. § 2254(a), the Court in *Sykes* held that noncompliance with a state's contemporaneous-objection rule was an independent and adequate state ground for denying habeas review, "absent a showing of cause for the noncompliance and some showing of actual prejudice resulting from the alleged constitutional violation." *Sykes,* 433 U.S. 72, 84, 87, 97 S.Ct. 2497, 2505, 2506, 53 L.Ed.2d 594. The majority opinion left "open for resolution in future decisions the precise definition of the 'cause'-and-'prejudice' standard" and observed "only that it is narrower than the standard set forth in dicta in *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), which would make federal habeas review generally available to state convicts absent a knowing and deliberate waiver of the federal constitutional contention." *Id.* at 87, 97 S.Ct. at 2506.[5]

Subsequent to the district court's decision in this case, the United States Supreme Court in *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982) took the opportunity to explain the meaning of "cause" as used in *Sykes.* In *Isaac,* the

4. Turning to the merits, the district judge concluded that the police never advised Hudson of the *Miranda* warnings, that Hudson never waived his Sixth Amendment right to assistance of counsel or his Fifth Amendment right to remain silent, that Hudson's statements were made involuntarily, and that the police obtained Hudson's statements in violation of *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). In light of these conclusions, the district court determined that Hudson's statement which implicated his accomplices, McFadden and Smith, was illegally obtained. Nevertheless, the district court held that no constitutional error resulted from the admission of the testimony of McFadden and Smith.

The district court reasoned that, although the fruit of the poisonous tree doctrine applies to both verbal and physical evidence under *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), "a closer, more direct link between the illegality and live-witness testimony is required before this kind of testimony will be suppressed" under *United States v. Ceccolini,* 435 U.S. 268, 279, 98 S.Ct. 1054, 1061, 55 L.Ed.2d 268 (1978). After considering the degree of free will exercised by McFadden

and Smith, the degree to which the fruits of the illegality were used to obtain the testimony of McFadden and Smith, and the time, place, and manner of the initial questioning of McFadden and Smith, the district court held that the testimony of Smith and McFadden was sufficiently attenuated from the illegality to permit its admission into evidence.

5. In his concurrence, Justice Stevens envisioned some degree of equitable discretion in the operation of the cause and prejudice exception:

Matters such as the competence of counsel, the procedural context in which the asserted waiver occurred, the character of the constitutional right at stake, and the overall fairness of the entire proceedings, may be more significant than the language of the test the Court purports to apply. I therefore believe the Court has wisely refrained from attempting to give precise content to its "cause"-and-"prejudice" exception to the rule of *Francis v. Henderson,* 425 U.S. 536 [96 S.Ct. 1708, 48 L.Ed.2d 149].

433 U.S. at 95–96, 97 S.Ct. at 2511 (Stevens, J., concurring).

Court held that state prisoners who fail to abide by a state contemporaneous-objection rule are barred from asserting, in federal habeas corpus proceedings, a constitutional challenge to jury instructions given in their state trials, absent cause for the failure to object and actual prejudice resulting from the constitutional violation.

*Isaac* involved three state prisoners who sought writs of habeas corpus based on a denial of due process resulting from the use of an unconstitutional self-defense instruction given at trial. Each prisoner had failed to comply with an Ohio procedural rule which required a contemporaneous objection to jury instructions. Under Ohio law, noncompliance with this rule bars appellate consideration of an objection. In rejecting the argument that the rule in *Sykes* should be limited "to cases in which the constitutional error did not affect the truthfinding function of the trial," the Court ruled that "any prisoner bringing a constitutional claim to the federal courthouse after a state procedural default must demonstrate cause and actual prejudice before obtaining relief." *Id.* 102 S.Ct. at 1572. The prisoners cited as cause: (1) the futility of making an objection in light of adverse state precedent, and (2) the novelty of the constitutional claim at the time of their trials.

The Court rejected outright futility as "cause," stating:

> [F]utility of presenting an objection to the state courts cannot alone constitute cause for a failure to object at trial. If a defendant perceives a constitutional claim and believes it may find favor in the federal courts, he may not bypass the state courts simply because he thinks they will be unsympathetic to the claim.

*Id.* 102 S.Ct. at 1572. The Court reasoned that the state court should have an opportunity to consider the constitutional claim, even when the state court has rejected the constitutional argument in the past.

The Court left open whether "novelty of a constitutional claim ever establishes cause for a failure to object," stating:

> We might hesitate to adopt a rule that would require trial counsel either to exercise extraordinary vision or to object to every aspect of the proceedings in the hope that some aspect might mask a latent constitutional claim. On the other hand, later discovery of a constitutional defect unknown at the time of trial does not invariably render the original trial fundamentally unfair. These concerns, however, need not detain us here since respondents' claims were far from unknown at the time of their trial.

*Id.* 102 S.Ct. at 1573. At least "[w]here the basis of a constitutional claim is available, and other defense counsel have perceived and litigated that claim," the Court concluded that "the demands of comity and finality counsel against labelling alleged unawareness of the objection as cause for a procedural default."[6] *Id.* 102 S.Ct. at 1574–75.

Hudson asserts that he could not have known at the time of trial that a witness, who is discovered as a result of information learned during an illegal interrogation of a criminal defendant, is excludable under the fruit of the poisonous tree doctrine.[7] Furthermore, Hudson urges that, unlike the claim in *Isaac*, his constitutional objection was novel because "there was no reported case in which the fruit of the poisonous tree doctrine had been asserted to exclude third-party testimony that was obtained through illegally seized evidence or improper interrogation." Our research, however, has turned up a number of reported cases prior

---

**6.** Applying this standard, the Court concluded that the claim therein was not novel as similar or identical claims had been litigated in "dozens" of cases in the years preceding the petitioners' trials.

**7.** Hudson does not argue that the illegal means used to obtain his statements presented novel issues of constitutional law, nor could he in light of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936); and *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

to Hudson's trial in which the issue was raised, sometimes successfully.[8]

Significantly, Hudson had Illinois case law precedent for his fruit of the poisonous tree argument. *People v. Albea,* 2 Ill.2d 317, 118 N.E.2d 277 (1954); *People v. Martin,* 382 Ill. 192, 46 N.E.2d 997 (1942). In *Albea,* the defendant, Albea, was convicted of unlawfully selling narcotics to Vaughn. Albea filed a motion to suppress the testimony of Vaughn on the ground that the witness was discovered as a result of an illegal search of Albea's apartment, in violation of his Fourth Amendment rights.[9] On appeal, the Illinois Supreme Court held Vaughn's testimony inadmissible because it constituted "evidence discovered in connection" with an unlawful search.[10] 2 Ill.2d 317, 323, 118 N.E.2d 277, 280 (1954). In *Martin,* police illegally searched the office of suspected abortionists and seized records containing the names of women upon whom abortions had been performed. Every witness who testified for the prosecution at trial was located by use of these records. Because the names of the witnesses were obtained solely from the illegal seizure, not also from a source independent of the illegality, the Illinois Supreme Court held that their testimony must be excluded pursuant to the Fourth Amendment of the United States Constitution, as well as provisions of the Illinois Constitution.

Moreover, the respondent points out that at the time of Hudson's trial, the Supreme Court had decided *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and that Hudson's attorney was aware of *Wong Sun.* Therein, the Court provided the following basis for Hudson's claim:

> [T]estimony as to matters observed during an unlawful invasion has been excluded in order to enforce the basic constitutional policies.... Thus, verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest ... is no less the "fruit" of official illegality than the more common tangible fruits of the unwarranted intrusion.... Nor do the policies underlying the exclusionary rule invite any logical distinction between physical and verbal evidence.

*Id.* at 485–86, 83 S.Ct. at 416.

■ We conclude that Hudson had an ample basis for making an objection to the admission of the accomplice testimony. Years in advance of his trial, other defense counsel perceived the constitutional claim Hudson now asserts and successfully litigated it. Because no cause exists for failing to object to the admissibility of the accomplice testimony, Hudson cannot raise the issue for habeas review. We need not, therefore, consider whether the testimony by the accomplices resulted in prejudice to Hudson. *Engle,* 102 S.Ct. at 1575 n. 43.

> It is true that the majority of the decisions in the State of Illinois involving illegal search and seizure concern themselves with the suppression of evidence in the form of papers, documents, records or other property. None has been brought to our attention involving the discovery and seizure of a human being who is later used as a material witness in a prosecution. However, we cannot be unmindful of the principles established by long precedent which have sought to preserve the sanctity of the home and the right of privacy of the individual merely because the evidence has changed from inanimate to animate form. It has been held that an illegal search cannot later be justified by the discovery of contraband property.... We see no reason for a different rule in this case when the ends of justice sought to be maintained are the same. 2 Ill.2d at 322, 118 N.E.2d at 279–80.

---

**8.** *See State v. O'Bremski,* 70 Wash.2d 425, 423 P.2d 530 (1967). *People v. Eddy,* 349 Mich. 637, 85 N.W.2d 117 (1957); *People v. Martin,* 382 Ill. 192, 46 N.E.2d 997 (1942); *People v. Albea,* 2 Ill.2d 317, 118 N.E.2d 277 (1954); *McLindon v. United States,* 329 F.2d 238 (D.C. Cir.1964); *Smith v. United States,* 344 F.2d 545 (D.C.Cir.1965); *State v. Rogers,* 27 Ohio Ops.2d 105, 198 N.E.2d 796 (1963); *United States v. Tane,* 329 F.2d 848 (2d Cir.1964); *see also* Ruffin, *Out on a Limb of the Poisonous Tree: The Tainted Witness,* 15 U.C.L.A.Rev. 32, 55 (1967); Comment, 115 U.Pa.L.Rev. 1136 (1967); Ptiler, *"The Fruit of the Poisonous Tree" Revisited and Shepardized,* 56 Calif.L.Rev. 579 (1968).

**9.** Albea also claimed that the search violated his rights provided by Section 6 of Article II of the Constitution of the State of Illinois.

**10.** The Illinois Supreme Court said:

## II. *Identification of Hudson by Neldon*

Hudson claims that the pretrial identification procedures used by the police were unnecessarily and prejudicially suggestive, tainting the subsequent in-court identification testimony by the witness Robert Neldon. Although the respondent concedes that the identification procedures were suggestive, the respondent claims that the in-court identification stems from a source independent of the suggestive procedures. The in-court identification testimony therefore presents a "fruit of the poisonous tree" issue.

A pretrial confrontation conducted in a manner which is "so unnecessarily suggestive and conducive to irreparable mistaken identification" denies an accused due process of law, *Stovall v. Denno*, 388 U.S. 293, 301–302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967), and a subsequent in-court identification is inadmissible if there is a "very substantial likelihood of irreparable misidentification," *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972). Even though the identification procedures are suggestive, however, "the central question [is] whether under the 'totality of circumstances' the identification was reliable...." *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *see also Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). In assessing the totality of the circumstances, we consider three inter-related factors: whether the procedures used were suggestive, whether exigent circumstances justified the use of the suggestive procedure, and whether the in-court identification was reliable despite any suggestivenes. *United States v. Cord*, 654 F.2d 490 (7th Cir.1981); *United States ex rel. Kirby v. Sturges*, 510 F.2d 397 (7th Cir.1975).

At an evidentiary hearing, Neldon testified to identifying Hudson under the following circumstances. Neldon identified Hudson in a show-up conducted at the police station a few hours after the crime was committed on May 22, 1967. A sergeant at the station told Neldon he wanted him to look at somebody in custody to see if Neldon recognized him as one of the perpetrators of the crime. Then, in the presence of the sergeant, a lieutenant, and the Chief of Police, Neldon viewed Hudson who was locked up in a jail cell and who was the only black man present. Neldon identified Hudson as a participant in the crime. According to Neldon, he had no doubt that he had identified the correct person.

Neldon also testified about his opportunity to view the perpetrators of the offense prior to identifying Hudson at the police station. Neldon recollected that, at the time of the attempted robbery, he (then 20 years old) and two friends (Conrad and Niemiec) were finishing their lunch in a car parked across from the shop on Western Avenue where the shooting occurred. All three were seated in the front seat, with Neldon in the middle, Conrad in the driver's seat, and Niemiec next to the passenger's door. At sometime between 11:15 a.m. and noon, Neldon heard an alarm sound from the shop. Turning his head toward the sound of the alarm, Neldon saw one man standing outside the shop and one man inside who fired or pointed a gun, and then departed from the shop. Both men proceeded to a car parked in front of the store. At this point, Neldon pushed Conrad into the back seat, started the car, and followed the assailants' car. Niemiec got down on the floor of the car.

The chase lasted for approximately four or five minutes. The assailants' car turned off Western Avenue onto a side street up to Vincennes Avenue, and then turned left onto Vincennes, a four-lane street with no other traffic during the chase. Neldon estimated that his car was a "couple of hundred feet behind" the assailants' car while on the side street, and was "three or four feet" behind on Vincennes. During the course of the pursuit on Vincennes, Neldon testified that he attempted to "pull up next to the car, pull up alongside" and that this enabled him to see the man (whom Neldon later identified as Hudson) in the back seat of the assailants' car. At this point, the two cars were within six or seven inches of each other. The man in the back seat of

the assailants' car began waving a gun, so Neldon backed his car off. The back window of the assailants' car then shattered and fell out. To avoid the line of fire, Neldon "ducked down behind the steering wheel a little bit," although he could still see the road. The assailants abandoned their car on Vincennes and fled on foot across some railroad tracks. Neldon parked his car "100 or 500" feet behind the assailants' car, and unsuccessfully attempted to follow.

Neldon estimated that during the pursuit, the fastest the cars travelled was 60 or 70 m.p.h., while the slowest was about 20 m.p.h. (when the cars proceeded through a gas station). During most of the chase, the man in the back seat faced towards Neldon's car.[11] Neldon could see facial features of the man in the rear seat "maybe 15 seconds worth of time . . . close up."

The district court found that Neldon's penchant for heroics "formed the reliability of his testimony." Although observing that Neldon's opportunity to view the fleeing criminals was brief, the district court found that Neldon's "concentration and fearlessness" in the pursuit gave reliability to his identification. Furthermore, the court considered it "highly unlikely" that Neldon would be affected by the suggestive identification procedure in light of his serious attitude and diligence with respect to the episode.

As we noted in *Hudson* II, Neldon's "identification of Hudson occurred under highly suggestive conditions. . . ." The numerous suggestive factors involved are (1) the show-up, no line-up procedure, (2) the police station atmosphere, (3) the presence of the sergeant, the lieutenant, and the

Chief of Police, (4) Hudson was in a jail cell, (5) Hudson was the only black man present, and (6) Neldon was young and had a penchant for heroics. Under these circumstances, it must have been clear to Neldon that the police thought Hudson had participated in the attempted robbery even if they did not state the obvious. Additionally, the state points to no justification for the suggestive procedures and the court will not speculate as to possible justifications.[12] Because the initial identification procedure was unnecessarily suggestive, we must determine whether the procedure was so "conducive to irreparable mistaken identification," *Stovall*, that allowing Neldon to identify Hudson in court denied Hudson of due process.

Under *Manson*, an identification engendered by a suggestive and unnecessary procedure may still be admitted if it is adequately reliable—based on the witness' mental imprint of the accused formed at the time of the crime, and unaffected by any observations, promptings or suggestions at the legally impermissible confrontation. The relevant factors in evaluating reliability are: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382; *accord Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253. The propriety of admitting into evidence the identification testimony of Neldon depends, therefore, upon whether

---

11. Neldon related,

> when we first started following behind him, he was facing towards us. When I pulled up alongside, then he swung around to face the side. When I backed off on the brakes to get back behind him again, then he turned back around to the back again. . . . He was facing us, watching what we were doing. . . .

12. The Illinois Supreme Court pointed out, however, that the sooner the confrontation, the more accurate the identification. *People v. Hudson*, 46 Ill.2d 177, 263 N.E.2d 473, 480

(1970). Additionally, the court reasoned that an immediate confrontation could lead to the release of an innocent suspect and alert police of the need to resume searching for the fleeing culprit. *Id.* We do not dispute the desirability of a prompt confrontation, yet question the necessity of Hudson being locked up while three police officers watched Neldon make his identification; furthermore, the record does not reveal any particular problem in quickly assembling a line-up in this instance.

his in-court identification was reliable, that is, based on a source independent of the police suggestion.[13] Since the primary illegality is established, the government bears the burden of proving by clear and convincing evidence that the in-court identification was based upon observations of the suspect other than at the prior, illegal identification, *United States v. Wade,* 388 U.S. 218, 240, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967), or, alternatively, of proving "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Judged by the *Biggers/Manson* criteria, we cannot say that the district court's finding of reliability by clear and convincing evidence is clearly erroneous.

1. *Opportunity for observation during the crime.* The longer the duration of the crime, the greater the opportunity to observe and study the perpetrator. Here, Neldon saw only Hudson's flight from the crime; including Hudson's exit from the shop, Neldon could have seen Hudson for at most five to six minutes. The attempted robbery occurred in the daytime during the spring. The distance between Hudson's car and Neldon's car ranged from 150 feet to 7 inches during the chase. The 10 to 15 seconds at the 7 inch distance might have provided Neldon a sufficient opportunity to form a mental image of Hudson, particularly as Niemiec was on the floor and no traffic obstructed Neldon's view. Moreover, during most of the chase, Hudson was turned facing toward Neldon. *See generally United States v. Cox,* 428 F.2d 683, 686 (7th Cir.1970) (identification by a police officer who saw the accused while fleeing and while "under conditions of good visibility at a reasonably short distance [45 to 60 feet] and for a period of several seconds.").

2. *Degree of attention.* During the chase, Neldon's attention was directed toward driving, watching the assailants' car, and observing the assailants. The district court was particularly impressed with Neldon's degree of concentration. When Hudson brandished what Neldon believed to be a gun, Neldon's attention was no doubt focused on Hudson. Furthermore, aware that the assailants had committed a crime, Neldon had a "desire to seek out and retain" an image of them. *United States ex rel. Phipps v. Follette,* 428 F.2d 912, 915 (2d Cir.1970). Although Neldon ducked to avoid any gunfire, this occurred after he had an opportunity to see Hudson close up.

3. *Prior description.* Neldon could not recall giving a description of Hudson prior to identifying him.

4. *Witness' certainty.* Neldon testified that he had no doubt that he had identified the right person. *See generally United States ex rel. Clark v. Fike,* 538 F.2d 750 (7th Cir.1976). Although this must be considered in light of the suggestive circumstances, the district court found that Neldon's character was resistant to suggestions of this type.

5. *Time between crime and identification.* Neldon made his identification of Hudson within a few hours after the crime. Thus, it is likely that the image of the assailant was fresh in Neldon's mind, and had not faded at the time of the identification. *Follette,* 428 F.2d at 915 ("the longer the interval, the greater the dangers that the initial image will have dimmed and that the second image will play a significant role.").

This case warrants deference to the district court which heard the testimony as well as to the state court. *Follette,* 428 F.2d at 916. Furthermore, admitting Neldon's testimony, if error, was harmless beyond a reasonable doubt, *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Wade v. United States,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Because the accomplice's testimony was properly admitted, there was ample evi-

---

**13.** An in-court identification has an independent source when "before the imprint arising from the unlawful identification procedure, there was already such a definite image in the witness' mind that he is able to rely on it at trial without much, if any, assistance from its successor." *United States ex rel. Phipps v. Follette,* 428 F.2d 912, 915 (2d Cir.1970).

dence to convict Hudson without the use of Neldon's in-court identification.

We therefore affirm the judgment of the district court.