Tyrone WALTON, Petitioner–Appellee,

v.

Michael P. LANE,
Respondent–Appellant.

No. 87–1581.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 6, 1987.

Decided July 15, 1988.

As Amended July 20, 1988.

Rehearing Denied Aug. 22, 1988.

Nathan P. Maddox, Asst. Atty. Gen., Springfield, Ill., for respondent-appellant.

Diana N. Cherry, Metnick & Barewin, Springfield, Ill., for petitioner-appellee.

Before POSNER and COFFEY, Circuit Judges, and NOLAND, Senior District Judge.*

COFFEY, Circuit Judge.

Respondent-appellant Michael Lane appeals the trial court's grant of Tyrone Walton's petition for a writ of habeas corpus. The district judge found that an unconstitutionally suggestive pretrial confrontation tainted the victim's in-court identification of Walton as the perpetrator of an armed robbery. We reverse.

I

The facts of this case are detailed in the decision of the Illinois appellate court on Walton's direct appeal from his armed robbery conviction. *People v. Walton*, 107 Ill.App.3d 698, 63 Ill.Dec. 351, 437 N.E.2d 1273 (1982). We are mindful that 28 U.S.C. § 2254(d)[1] requires us to presume the accuracy of state court findings of fact. *Sumner v. Mata*, 455 U.S. 591, 597–98, 102 S.Ct. 1303, 1306–07, 71 L.Ed.2d 480 (1982). *See also United States ex rel. Haywood v. O'Leary*, 827 F.2d 52, 53 (7th Cir.1987); *United States ex rel. Kosik v. Napoli*, 814 F.2d 1151, 1153 & nn. 1, 2 (7th Cir.1987). The Illinois appellate court reported the facts as follows:

"At approximately 1 p.m., on February 12, 1981, the victim, of Bloomington, was robbed at gunpoint while walking in the vicinity of his home. The robber engaged him in conversation prior to the robbery, but according to the victim, the entire incident took no more than 10 or 15 minutes. After he was robbed, he went immediately to his home and reported the incident to police. He described his assailant as a black man of slim build, approximately six feet in height, weighing 150 or 160 pounds. The robber wore a long tweed trench coat and a stocking cap, and was approximately 20 years old. Officer Frank, of the Bloomington police department stated that when he first arrived at the victim's residence following the robbery, the victim was highly agitated, shaking, and spoke with a nervous voice.

Shortly after the robbery, Officer Bauer, who had heard a radio report of the incident, noticed that a short black male appeared to be leaning forward and stuffing something under the wrong seat of a suspicious automobile driven by a taller black male which the officer was following. Bauer stopped the vehicle and ordered the two occupants out. The car was driven by defendant, and the other occupant was Jimmie Dale Hannah, who was known by Bauer to have a revoked driver's license. Bauer subsequently discovered a tweed coat on the floor of the car where Hannah's legs would have been. He checked the coat for identification and found a stocking hat, a pair of gloves, and a billfold containing the victim's identification papers. The defendant was thereupon arrested and placed in a holding cell at the Bloomington police station.

Less than 75 minutes after the robbery, the victim was brought into the Bloomington police station's cellblock area. He had previously been shown his wallet, which police told him was taken from a suspect who was in custody. As soon as he saw defendant, he pointed at him and said, 'That's him. That's him.' The defendant was apparently the only

---

* Honorable James E. Noland, Senior District Judge for the Southern District of Indiana, is sitting by designation.

1. Title 28, § 2254(d) provides:
   "(d) In any proceeding instituted in a federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court, a determination after a hearing on the merits of a factual issue, made by a state court of competent jurisdiction in a proceeding to which the applicant for the writ and the state or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct...."

person in the cellblock at the time and was the only suspect shown to the victim. The defendant was not wearing an overcoat or hat at the time the victim identified him. Persons arrested by the Bloomington police department are normally taken to the McLean County jail when they are to be held in custody for more than a short period of time, and lineups usually take place there. It usually takes from one to three hours to organize a lineup.

At a hearing on defendant's motion to suppress the victim's identification of defendant at the showup and the fruits of the search of the automobile which defendant was driving when arrested, the victim stated that he really was not certain whether he had seen defendant prior to the robbery, since a lot of black people look alike. He also stated that on the afternoon of the robbery, he was in no hurry to leave the police department.

At trial of this cause, he also made an in-court identification of defendant and stated that defendant was the person who accosted him. Under cross-examination, he acknowledged that the defendant was 'not really' slim, that he appeared approximately six feet two-to-six feet three inches tall, weighed approximately 170 pounds and was approximately 23 to 25 years old. He further testified that he was convicted of burglary in 1971 and that for the past five or six years had periodically been under a doctor's care for his 'nerves.' He had voluntarily been a resident in a Decatur mental hospital, where he underwent treatment for his nervous condition, from November 1980 to January 1981. He had never been involuntarily committed to a State hospital. When his nerves got 'real bad' they caused him 'not to think too good', but he was 'completely right' on February 12, 1981. He also described the medication which he took as part of his treatment."

*Walton*, 437 N.E.2d at 1274–75. Following the petitioner's jury trial in the Circuit Court of McLean County, Illinois, Walton was convicted of armed robbery and sentenced to 25 years' imprisonment.

Affirming his conviction, the Illinois appellate court rejected the argument Walton advances in this appeal—that the victim's in-court identification of Walton as the man who robbed him should have been excluded because it was based on an unconstitutionally suggestive police station identification procedure that took place shortly after the crime. The court reasoned that: (1) "the indicia of the reliability of his [the victim's] identification of defendant, coupled with the need for the police to promptly determine whether his robber had been apprehended, outweigh any prejudice accruing to defendant as a result of the suggestiveness of the pre-trial identification procedure"; and (2) "since the victim's in-court identification of defendant ... possess[ed] sufficient indicia of reliability, and did not stem from an improper out-of-court identification, the trial court acted properly in permitting this identification." 437 N.E.2d at 1276.

After the Illinois Supreme Court denied Walton's petition for leave to appeal, Walton petitioned the federal district court for a writ of habeas corpus, alleging that the introduction of the victim's identification of Walton as the perpetrator violated his right to procedural due process under the Fourteenth Amendment because of the suggestiveness of the pre-trial identification procedures. Applying the test set forth in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the habeas court granted the writ, finding that the high degree of suggestiveness of the showup procedure (in particular the fact that the police told the victim that his wallet had been recovered from the subject of the showup) outweighed any indicia of reliability surrounding the pre-trial identification. The warden's appeal from the district court's grant of the writ requires this court to determine whether, despite any suggestiveness of the pre-trial identification procedure, the identification is nevertheless "reliable to a degree that it does not create a very substantial likelihood of irreparable misidentification." *Haywood*, 827 F.2d at 57.

## II

Walton argues, as he did before the habeas court, that the victim's trial identification of him was so tainted by the suggestive identification procedure that the procedure gave rise to a "very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). Walton insists that: (1) the identification procedure was unduly suggestive because immediately prior to the showup the police told the victim that his wallet had been recovered from a suspect who was in custody;[2] and (2) the sequence of events surrounding the victim's alleged encounter with Walton on February 12, 1981, were such that under the totality of the circumstances, the victim's identification was unreliable.

A pretrial confrontation conducted in a manner which is "so unnecessarily suggestive and conducive to irreparable mistaken identification" denies an accused due process of law, *Stovall v. Denno*, 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967), and a subsequent in-court identification is inadmissible if there is a "very substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972). "Even though the identification procedures are suggestive, however, 'the central question [is] whether under the "totality of the circumstances" the identification was reliable....'" *United States ex rel. Hudson v. Brierton*, 699 F.2d 917, 923 (7th Cir.1983) (quoting *Neil*, 409 U.S. at 199, 93 S.Ct. at 382). Thus, under *Manson*,

> "an identification engendered by a suggestive and unnecessary procedure may still be admitted if it is adequately reliable—based on the witness'[s] mental imprint of the accused formed at the time of the crime, and unaffected by any observations, promptings or suggestions at the legally impermissible confrontation.... The propriety of admitting into

evidence the identification testimony of [the victim] depends, therefore, upon whether his in-court identification was reliable, that is, based on a source independent of the police suggestion."

*Hudson*, 699 F.2d at 924–25 (footnote omitted). *See also United States ex rel. Kosik v. Napoli*, 814 F.2d 1151, 1155 (7th Cir. 1987). Because we hold that the victim's identification of Walton possesses sufficient indicia of reliability to prevent a very substantial likelihood of misidentification, we assume (but need not decide) for the purposes of analysis that the pre-trial confrontation in this case was unduly suggestive.

We therefore proceed to scrutinize the second prong of the *Manson* test, which requires a determination of reliability under the "totality of the circumstances." Despite the imprecision of a test couched in terms of the "totality of the circumstances," the Supreme Court has set forth several specific factors that bear on the question of the reliability of an identification procedure. These factors are:

> "the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."

432 U.S. at 114, 97 S.Ct. at 2253.

In reviewing these factors, we note that while "[t]he ultimate determination whether the identification is reliable is a mixed question of law and fact ..., findings of subsidiary facts made by the state court (i.e. the opportunity of the witness to observe the suspect) are entitled to a presumption of correctness." *Love v. Young*, 781 F.2d 1307, 1311 (7th Cir.1986). Further, in *Kosik, supra*, we explained that our review of the reliability of an identification is limited:

---

**2.** The victim testified that it was his understanding that the police were going to show him more than one suspect in the six holding cells at the Bloomington Police Department. The record fails to reflect whether any of the other cells were or were not occupied and because the victim identified the first suspect he was shown, he lacked actual knowledge of whether other cells were in fact occupied. *See infra* note 5.

"It is, of course, not our function in this setting to judge the ultimate accuracy of the identification [ ]; that decision was made by the jury in its role as finder of the facts. Our role is a more limited one of determining if the identification was so unreliable that the defendant's due process right to fair judicial procedures should have precluded an identification at trial.... Thus, we determine here only whether the entire evidence regarding [this identification] afforded [it] sufficient reliability to reach the jury despite any undue suggestiveness...."

814 F.2d at 1136 (citations omitted) (footnote omitted). With these principles in mind, we turn to an examination of the district court's (and the Illinois appellate court's) application of the *Brathwaite* factors to the facts of this case.

**A. The Opportunity of the Victim to View Walton at the Time of the Crime**

■ The Illinois appellate court found that the victim "had a clear view of defendant for at least five to ten minutes while standing outside in the early afternoon ... [and] thus had ample opportunity to view the defendant at the time of the robbery." 437 N.E.2d at 1275. The habeas court disagreed with the factual finding that the entire incident could have taken that long. In the court's view, the victim's testimony of the sequence of events leading to the robbery "does not support such a determination." That testimony is as follows:

"... I was at the neighborhood coffee shop having my lunch and then I started home. And when I got in front of my—out in front of the house this black fellow, Tyrone Walton, he was coming up the street and he said—he stopped right in front of my house and he said, 'Do you know a person named Bob?' And I said, 'Bob who? Bob Hopkins?' And he said, 'No.' He said, 'Some other fella that's supposed to live around here.' He said, 'Give me a cigarette.' And I gave him a cigarette and I said, 'Well, I've gotta go,' and I turned around to go in the house again and he said, 'Come here,' again. And when I came there then he pulled out this gun and he said, 'Now I want

you to give me all your money and I'm not playing.' Only he said he'd shoot me but he wasn't playing.

... He told me to take a walk after he told me to check my pockets and everything and give him all I had, and I told him, 'No. I don't have a telephone. I won't call the law,' because I was scared because he had a gun in his hand and he might have took me somewhere and just blowed my brains out. So I—after I told him that then I walked away and I turned around and looked at him and he was walking for about twenty feet and then all of a sudden he started running."

According to the district court, "[i]t is obvious from this testimony that the entire incident could not have taken as long as ten minutes and certainly not fifteen. Furthermore, much of the victim's time was spent turning and walking away from the robber. The victim's opportunity to view was limited and is not a sufficient indicium of reliability, whether standing alone or in consideration with the other *Brathwaite* factors."

■ Initially we note that the habeas court's ruling is premised, although not explicitly, on an exception to the rule presuming the correctness of state court factual determinations, which allows the federal courts to make a contrary finding of fact only if "on a consideration of ... the record as a whole [the federal court] concludes that such factual determination is not fairly supported by the record." 28 U.S.C. § 2254(d)(8). We do not agree that the record fails to support the state court's finding that the entire incident took at least five minutes and that the (d)(8) exception should be invoked and the finding rejected. Because it is far removed from the victim's actual testimony, a habeas court must be hesitant to substitute its judgment for that of the trier-of-fact, who had the opportunity to observe the character and demeanor of each witness's testimony and is thus in a better position to judge and weigh the question of credibility. The district court appears to have overstepped its bounds and engaged in impermissible judicial fact-finding when it ruled that the victim's opportunity to view the perpetrator was inade-

quate and in our opinion is unsupportable in the record.

Nevertheless, it is unnecessary for us to resolve whether the incident took five, ten or fifteen minutes because regardless of the precise time that elapsed during the incident, the victim's testimony provides abundant support for the state court's finding that the length of his exposure and proximity to the perpetrator of the crime was more than sufficient to enable him to form a definite and specific impression of the perpetrator's appearance. The robbery occurred in broad daylight under ideal conditions for the making of an identification; thus the time of actual exposure becomes less critical. And despite the district court's unusual and unsupportable finding that much of the victim's time was spent turning and walking away from the robber, the record also reveals that the robber engaged the victim in face-to-face conversation immediately prior to and during the robbery. This court has found identifications to be reliable when the opportunity to view is far more problematic (involving only *seconds* of exposure, as contrasted with the *minutes* of exposure available in this case) than the victim's opportunity to observe in this factual situation. *Cf. Kosik*, 814 F.2d at 1157 (the witnesses had "only a short period of time" [a few seconds] under street lights at night to view the driver of a car); *United States v. Cox*, 428 F.2d 683, 685–86 (7th Cir.1970) (witness saw the suspect for a period of several seconds under "good visibility" at a distance of 45 to 60 feet). Thus, we hold that the record provides more than sufficient support for the Illinois appellate court's finding that the victim "had ample opportunity to view the defendant at the time of the robbery." The district court's contrary conclusion is not, in our view, supported by a fair reading of the record.[3]

### B. The Victim's Degree of Attention

The Illinois appellate court found that the victim's degree of attention also weighed in favor of the reliability of his identification. Specifically addressing this factor, the court stated that "the witness and defendant were alone at the time of the robbery and his attention was thus obviously focused on defendant." 437 N.E. 2d at 1275–76. The habeas court took issue also with this finding, noting the victim's history of having a nervous condition, and police testimony that shortly following the crime, he was "highly agitated, shaken, and spoke with a nervous voice."

In contrast to the "opportunity to view" factor, "attentiveness requires the court to determine if the witness [ ] actually took advantage of the opportunity ... [and] what degree of attentiveness the witness[ ] displayed." *Kosik*, 814 F.2d at 1158. The district court implicitly reasoned that the victim's agitated state immediately *following the incident* demonstrated a low degree of attentiveness *during the robbery*. Without any expert testimony to support the finding, we do not believe that conclusion necessarily follows from the premise. The warden properly notes that a victim's nervousness and agitation following an armed robbery is certainly a natural and human reaction to a most traumatic event. Admittedly, an abnormally high degree of agitation may ultimately detract from the reliability of an identification, but a finding of unreliability, as a matter of law, is not mandated merely because the victim appeared nervous following the crime. If every robbery victim who appeared nerv-

---

**3.** The district court also noted that "[t]he opportunity [to view] must not have been too good considering the victim's remark *when asked to describe the robber* that a lot of blacks look alike." (Emphasis added). As the warden points out, the district court appears to have taken this statement out of context. The statement came not in response to a request for a description of the robber, but rather in response to a question on cross-examination as to whether the victim had ever seen Walton prior to the robbery. The victim testified: "Well, I thought maybe I did [see Walton prior to the robbery]. I don't know whether I did for sure or not because a lot of black people look alike." Taken in context, the statement fails to detract from either the victim's opportunity to observe or the accuracy of his description of the perpetrator. While we understand the court's frustration with such a fatuous statement, we do not believe that this witness's answer, taken out of context, alone renders his identification so inherently unreliable as to justify the finding of an unreliable identification as a matter of law.

ous immediately after the crime were to have his or her testimony discredited because of his or her nervous condition, the courts and juries would never be able to convict. The question of whether the victim's agitated state rendered him incapable of making a positive I.D. was presented to the jury and was properly one for the trier of fact to resolve. We refuse to second-guess the jury's resolution under the circumstances present here.

We agree with the Illinois appellate court's finding that the victim's degree of attentiveness must have been relatively high given that the perpetrator was alone with the victim, and that the victim's attention was focused solely on the robber (at least during the times he was not turning and walking away from the robber).[4] Finally, the victim's attentiveness is borne out by his rather detailed description of the robber (the I.D. provided a sufficient basis for the officer's apprehension of the suspect) as a black male, approximately six feet in height, weighing 150 to 160 pounds and approximately 20 years old who wore a trench coat and a stocking cap. At trial, the victim testified that Walton was approximately 6 foot 2–3 inches tall, weighed 170 pounds and was 23–25 years old. Although the description was not as perfect as a prosecutor would have liked, the victim's identification of the physical characteristics of the suspected assailant could certainly be classified as accurate.

### C. The Accuracy of the Victim's Pre-Trial Description of Walton

The accuracy of description factor "helps the court determine if and when the witness developed and expressed a concrete and specific impression of the individual's characteristics firm enough to remain reli-

able despite the vagaries of time and the pressures of any undue suggestiveness." *Kosik*, 814 F.2d at 1159. The Illinois appellate court noted that the victim "provided a rather accurate description of defendant, including a description of his height, weight and wearing apparel," and that "[t]he minor discrepancies in his description of defendant on the day of the robbery and his description of defendant at trial which essentially amount to a difference in the estimate of defendant's weight of approximately 20 pounds and a difference in the estimate of defendant's height of two to three inches, are immaterial in view of the other factors which support the reliability of the victim's identification." 437 N.E.2d at 1276. Thus, before the allegedly suggestive identification procedure, the victim had accurately described Walton's approximate age, height, skin color, and weight. While this description is clearly not exhaustive, it is consistent with Walton's physical makeup, and was communicated to the police prior to the challenged identification procedure. Consequently, the accuracy of the prior description bolsters the reliability of the identification. *See, e.g., Biggers*, 409 U.S. at 200, 93 S.Ct. at 383; *Haywood*, 827 F.2d at 60; *Kosik*, 814 F.2d at 1159.

### D. The Level of Certainty Displayed by the Victim in His Pre-Trial Identification of Walton

The victim made positive identifications of Walton at both the pre-trial showup and the trial. "Determinations of the reliability suggested by a witness's certainty after the use of suggestive procedures are complicated by the possibility that the certainty may reflect the corrupting effect of the suggestive procedures." *Kosik*, 814 F.2d at 359. Still, "[t]his difficulty has not pre-

---

**4.** Walton also notes that the victim testified he could not recall whether or not the robber sported facial hair due to the fact that the robber's gun scared him. Walton maintains that this testimony establishes a low degree of attentiveness on the part of the victim to the physical features of his attacker. Confronting an analogous issue in *Kosik*, we noted that "[b]oth parties to this action have argued that *under gunfire* one necessarily is, or is not, attentive. It takes no more than common sense to recognize that

neither result *necessarily* follows." 814 F.2d at 1158. Analogously, while the presence of a weapon will obviously divert a victim's attention to the weapon, the length and proximity of the instant encounter weighs strongly against the conclusion that the victim's *undivided* attention was on the weapon during the entire robbery. Petitioner's fly-specking of the record in his attempt to argue that the victim was inattentive during the encounter is unpersuasive.

vented courts from finding sufficient certainty even when the evidence of certainty comes from confrontations that took place after the invocation of suggestive procedures." *Id.* The Illinois appellate court found that the level of certainty factor weighed especially heavily in favor of the reliability of the identification because "[u]pon first seeing defendant in the cell-block, he *spontaneously* identified him as his robber, thus signifying that he was completely certain of his identification." 437 N.E.2d at 1276. At trial, the victim testified that the police told him they were planning to show him more than one person, but since he positively identified the first as the perpetrator,[5] the show-up ceased after the victim made his identification. We agree that the spontaneity of the identification in this case (the victim thought he was going to be shown other suspects, but due to his high level of certainty, identified the first person he was shown), significantly decreases the possibility that the victim's certainty merely reflected the corrupting effect of the allegedly suggestive procedures. Moreover, as both the trial court and the Illinois appellate court noted, the victim never wavered in his identification of Walton as the robber. Thus, we hold that the level of certainty factor weighs heavily in favor of the reliability of the identification.

### E. The Time Between the Crime and the Pre–Trial Confrontation

We have held that time lapses between the incident and the pre-trial identification ranging from several weeks to months insufficient by itself to raise serious question about reliability. *Cf. Kosik*, 814 F.2d at 1161 (positive photo I.D. made one month after incident); *United States v. Goodman*, 797 F.2d 468, 471 (7th Cir.1986) (two months from incident to identification at suggestive pre-trial proceeding); *Biggers*, 409 U.S. at 201, 93 S.Ct. at 383 (seven months between incident and first identification of defendant). In this case, the time between the armed robbery and the victim's pre-trial identification of Walton (a mere 75 minutes) heavily favors the reliability of the identification.

### III

Considering these indicia of reliability in their entirety against the corrupting effect of the allegedly unduly suggestive procedures, we conclude that there was not a substantial likelihood of irreparable misidentification. Although identifications arising from a one-man showup are inherently more suspicious than those arising from the usual police lineup, *see, e.g., United States ex rel. Hudson v. Brierton*, 699 F.2d 917, 923–25 (7th Cir.), *cert. denied*, 464 U.S. 833, 104 S.Ct. 114, 78 L.Ed.2d 115 (1983), and in this case this inherent suggestiveness was exacerbated when the police told the victim that his wallet had been recovered from the subject of the showup, the *Brathwaite* factors all weigh in favor of reliability despite any possible corrupting effect of the alleged suggestive procedures. Hence, we are unable to conclude that there is a "very substantial likelihood of irreparable misidentification," resulting from the I.D. procedure. Short of that point, the ultimate reliability of the victim's identification of Walton as the perpetrator is for the jury to decide. Any defect, if there be one, is simply not one of constitutional dimension, and merely goes to the weight of the identification evidence.

The decision of the district court is RE-VERSED.

---

**5.** On cross-examination during the government's case-in-chief, the following exchange took place:

"Q: How many people did they show you at the Bloomington police department?
A: They started walking back through the cells and the first one I seen was him.

Q: So, they showed you one person?
A: They were going to take me on further and show me some more; but, I seen him and knew him—I mean, I didn't know him. I knew what he had looked like and I remembered."