UNITED STATES of America, Plaintiff–Appellee,

v.

Jeffrey Earl JOHNSON, Defendant–Appellant.

No. 87–2866.

United States Court of Appeals, Seventh Circuit.

Argued April 13, 1988.

Decided Oct. 18, 1988.

Douglas I. Henderson, Kenosha, Wis., for defendant-appellant.

Ann M. Kisting, Asst. U.S. Atty., Patricia J. Gorence, U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before MANION and KANNE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

MANION, Circuit Judge.

A jury found Jeffrey Earl Johnson guilty of committing unarmed bank robbery, 18 U.S.C. §§ 2, 2113(a), after two tellers identified him in court as the robber. The district court had rejected his earlier attempts to suppress that identification testimony. Johnson appeals on the grounds that the identifications should have been suppressed. We affirm.

## I. NATURE OF THE CASE

The Marquette Savings & Loan is a small bank in Milwaukee, Wisconsin. The bank has a broad front window; tellers can easily observe activity outside the building. On the morning of October 6, 1986, tellers Linda Carmody and Vicky Komans noticed three black men—whom they later identified in court as defendant Johnson and his co-defendants Archie Gill and Phillip Nolan—park in a parking lot in front of the bank. Instead of parking between the lines, they parked in an unusual backward position with the car facing out of instead of into the lot.

The men then entered the bank through a back door rarely used by customers. They walked up to Carmody's teller station and asked her whether an "Ivory Daniels" worked there. When Carmody responded that there was no employee there by that name, one of the men asked her to make change for a $20 bill. She refused. The men approached Komans's station. Archie Gill stepped forward and placed a $20 bill on the counter. After the men repeatedly asked for change, Komans opened her cash

drawer to accommodate the request. Defendant Johnson quickly reached around the teller station and grabbed approximately $360 from the drawer. While a video surveillance camera recorded the men's entry into the bank and their interchanges with the two tellers, the actual theft was not within the camera's range. All three men fled.

Subsequently, on January 21, 1987, Komans and Carmody viewed a lineup containing co-defendant Nolan. The two tellers tentatively selected Nolan. However, they asked to see his teeth, because they remembered that one robber had a distinctive gap between the front teeth. Nolan, however, refused to cooperate, so the lineup was terminated.

On May 8, 1987, an FBI agent, Daniel Craft, separately visited Komans and Carmody and showed each two separate photographic arrays. The first array consisted of color photographs of seven young black men of similar height. This array contained photographs of both defendants, Johnson and co-defendant Gill. Four of the individuals, including Johnson, had close-cut hair, and five of the seven, including Johnson, had relatively minimal facial hair. No individual had a distinctive hair style or clothing. Komans selected Johnson's photograph, though she indicated that the robber had a lighter complexion than the individual in the photograph.

When Komans inquired about the individual she identified at the lineup, and indicated she could identify him again, the agent presented to her the second array. This array consisted of 26 similarly posed color photographs of young black men. In addition to Nolan, this array once again contained Gill and Johnson. Gill and Johnson were the only two individuals in both arrays. Komans again selected Johnson's photo; Komans indicated that in this photograph—a mug shot taken four years earlier—his complexion matched that which she recalled from the robbery. She continued reviewing the photographs and identified Nolan as the individual with the gap in his teeth.

Carmody also picked defendant Johnson from the first array, though she indicated that she could not be positive. She definitely identified defendant Johnson as well as co-defendant Nolan from the second. Neither witness was able to identify Gill.

## II. NATURE OF THE PROCEEDINGS

On May 19, 1987, a grand jury returned a one-count superseding indictment against Gill, Johnson, and Nolan, charging them with violating 18 U.S.C. §§ 2 and 2113(a) by entering a savings and loan association with intent to commit a larceny.

On June 19, 1987, Johnson, represented by appointed counsel, filed a motion to suppress "any out-of-court identification made of the defendant ... because the procedure used was unduly suggestive ... [and] the identification did not have such indicia of reliability that would indicate, under the totality of the circumstances, that the identification was valid." In particular, Johnson's motion cited the time—seven months—which elapsed between the offense and viewing the photographs and further charged that the tellers did not identify him with sufficient certainty. While his motion was poorly worded, we assume for purposes of deciding this appeal that Johnson wanted to suppress any in-court identification as well as any reference to the pretrial identifications. The district court referred the motion to suppress to Magistrate Bittner. The parties stipulated that "the only material issue of fact involves the suggestiveness of the photographic array as constituted and specifically whether the placing of both co-defendants in each array was impermissibly suggestive." The magistrate scheduled a hearing for July 2, 1987, and ordered the United States Marshal to transport Johnson to the hearing.

For unexplained reasons, the Marshal failed to transport Johnson to the hearing. Johnson's counsel, however, agreed with the magistrate three times that if the court decided that the array was not suggestive, then an evidentiary hearing would not be necessary. Defense counsel further stated that Johnson's presence would become necessary only if the tellers were called to

testify. The magistrate then stated that if he found the arrays suggestive, then he would schedule a second hearing to determine if the tellers' identification was reliable under the totality of the circumstances. The magistrate then asked, "Does that take care of the problem that the defendant isn't here today?" Defense counsel responded, "I would tend to agree, your Honor." The magistrate conducted the evidentiary hearing in which the United States Attorney established foundation by introducing Agent Craft's live testimony.

The magistrate issued his recommendation to the district judge on July 8, 1987. The magistrate isolated Johnson's complaint as being that his photo and that of co-defendant Gill were the only two included in both arrays. The magistrate first confronted whether the photographic identification procedures were unduly suggestive, that is, whether the procedure "suggested" to the tellers whom to pick out:

> Examination of the photographs presented in each of the photographic arrays reveals a number of black men who appear to be approximately the same age as defendant Johnson. Both photographic arrays include photographs of individuals who possess observable commonalities with the defendant, and no particular man stands out of any of the arrays as being unusually distinctive. Nor has defense counsel articulated any aspect of the individual photographs rendering the photo arrays unduly suggestive.
>
> Defense counsel's sole contention regarding suggestivity relates to the inclusion of photographs of both defendants . . . in both arrays. In some cases, serial presentations of photographs might be unduly suggestive. However, that is not the situation here, where both witnesses identified defendant Johnson in the first photographic array. The second photographic array was presented to enable an identification of an additional participant in the bank robbery, and was largely superfluous as to the identification of defendant Johnson. Nonetheless . . . both witnesses again picked out of the array the photograph of defendant Johnson.

The court accordingly concluded that the photographic arrays were not impermissibly suggestive as to content or as to procedure and recommended that Johnson's motion to suppress be denied. The recommendation notified Johnson that pursuant to 28 U.S.C. §§ 636(b)(1)(B), (C) and Local Rule 13.03 of the Eastern District of Wisconsin, any objections to the recommendation had to be filed within 10 days and that "[f]ailure to do so will result in a waiver of your right to appeal."

Johnson did not file any written objections to the magistrate's recommendations. Rather, within the 10–day period, on July 9, 1987, Johnson, through counsel, filed a supplemental motion to suppress identification and requested a further evidentiary hearing on this new motion. Johnson sought to reopen on the basis of newly discovered information. According to that information, which the government has since stipulated is true, the photo of Johnson which was part of the *second* array was aired by Milwaukee television Channel 12 in a news broadcast on February 4, 1987, as part of a segment known as "Crime Line Anonymous." The segment was about Johnson's alleged participation in a robbery occurring on January 6, 1987, at Mutual Savings and Loan, a different bank. Further, a photocopy of the same photo was posted in a third bank, the First Bank Milwaukee, located about 10 miles from the bank where the tellers worked, again in connection with Johnson's participation in the Mutual Savings and Loan robbery. For ease of explanation, the display of Johnson's photograph on the television show and in the unrelated bank shall be referred to collectively as "the published photographs."

According to Johnson's counsel's affidavit, Johnson's family told him only after the hearing on July 2 that the second photo was widely circulated in Milwaukee banks and shown on a local television program. While he had forwarded to Johnson copies of all discovery papers filed by the government so that Johnson could advise him of any additional factual information, because Johnson was not at the hearing he "was unable to garner the defendant's impres-

sions concerning the photocopies of the photographs purportedly shown to the eye-witnesses." In an accompanying memorandum, Johnson's counsel stated that he mailed the photographic arrays to Johnson on June 26, 1987, though he did not state when he had them available to mail. In the memorandum, Johnson's counsel admitted that it was "strictly conjecture [that] had the defendant been present he might have been able to alert counsel to the fact that one of his photos had been publicly circulated."

On July 23, 1987, the court, with counsel and Johnson present, conducted a full hearing on Johnson's pending motions. Both sides presented oral argument and made proffers. The tellers were available to be called as witnesses. At the hearing, Johnson's counsel again admitted that the hypothesis that Johnson could have earlier told him about the published photographs "may be conjecture." In response to a question from the court, Johnson's counsel stated that the prosecutor had informed him that the two tellers had told her that neither had seen the published photographs, and that he had "no reason to doubt her statement." But he was concerned that even if they did not remember seeing it, they still may have had an opportunity to see it which they did not remember: "It's not whether they can tell me they saw it or didn't see it, unless they can establish that they weren't in a position to see it." Johnson's counsel further admitted that while he could not establish that the tellers saw the photo in question, "it is clear that they had ample opportunity to view the same." Thus, Johnson argued, the *possibility* that the tellers viewed these other displays of the photo "amounts to suggestiveness per se." In a follow-up letter to the district court dated July 23, 1987, Johnson's counsel again argued that "use of the subject photo in the array after it had been widely distributed to the public, particularly when other photos of the defendant apparently existed, was impermissibly suggestive in and of itself."

On July 24, 1987, the district court denied Johnson's supplemental motion to suppress. The district court began by stating that Johnson had presented no reason to set aside the magistrate's recommendation, and that it was not required to conduct a *de novo* review of any uncontested issue. The court added that no error had been committed by Johnson's absence at the suppression hearing because his presence could not have affected how to resolve the purely legal issue presented at the hearing. With regard to the motion to reopen, the court held that before it would reconsider the magistrate's recommendations, Johnson would have to establish that the new evidence taints the array in some way which the magistrate had not considered. If Johnson did establish that this new evidence does taint the array, then it would have to decide whether to hold another evidentiary hearing. Having set up that standard, the court then refused to reopen, finding that Johnson had "failed to demonstrate any facts to warrant an additional hearing." The court therefore denied Johnson's supplemental motion to suppress and for an evidentiary hearing.

On another procedural front, Johnson moved to sever his trial from those of his two co-defendants. He argued that both tellers identified Nolan in the lineup and the bank's surveillance photographs clearly depict Gill. According to Johnson's motion, this additional evidence, over and above the tellers' eyewitness identifications, "make it highly probable that a positive identification of one or more co-defendants will severely prejudice the defendant Johnson in that the jury may tend to impute the stronger inferences of guilt pointing to defendants Gill and Nolan to the defendant Johnson." In addition, he claimed the differences in the strength of the identification evidence between himself and the other two could confuse the jury, and that even in the tellers' own minds the certainty with which they identified another robber would be imputed to Johnson. The district court declined to sever Johnson's trial.

At trial, the tellers identified Johnson and his two co-defendants as the robbers. They also described how they had earlier selected him from the photo arrays. The jury returned a guilty verdict against all

three defendants. Johnson was sentenced to seven years in prison and ordered to make restitution jointly. He timely appeals.

### III. ANALYSIS

■ A pretrial identification procedure "so unnecessarily suggestive and conducive to irreparable mistaken identification" denies an accused due process of law, *Stovall v. Denno*, 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967), and a subsequent in-court identification is inadmissible if there is " 'a very substantial likelihood of irreparable misidentification.' " *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972); *Walton v. Lane*, 852 F.2d 268, 271 (7th Cir.1988). Whether a pretrial identification procedure is unduly suggestive and whether a witness's subsequent identification is nonetheless reliable under the totality of the circumstances are two separate inquiries that should be approached sequentially:

> "[A]n identification engendered by a suggestive and unnecessary procedure may still be admitted if it is adequately reliable—based on the witness'[s] mental imprint of the accused formed at the time of the crime, and unaffected by any observations, promptings or suggestions at the legally impermissible confrontation.... The propriety of admitting into evidence the identification testimony of [the victim] depends, therefore, upon whether his in-court identification was reliable, that is, based on a source independent of the police suggestion."

*Id.* (quoting *United States ex rel. Hudson v. Brierton*, 699 F.2d 917, 924–25 (7th Cir. 1983) (footnote omitted in original)).

■ Johnson did not within the required 10 days challenge the magistrate's finding that the identification procedures Agent Craft used on May 9, 1987 were not suggestive. Therefore, the district court did not err in denying Johnson *de novo* review of the magistrate's findings and properly adopted his recommendation. By not objecting before the district court, Johnson has waived his right to appeal the district court's adoption of the magistrate's recommendation. *See Lockert v. Faulkner*, 843 F.2d 1015, 1017 (7th Cir.1988). Even now Johnson acknowledges that—given the record at the time of his decision—the magistrate did not err.

■ This waiver includes any challenge to the magistrate's going forward in Johnson's absence. In any event, going forward in Johnson's absence was not erroneous. At the suppression hearing, Johnson's counsel expressly consented to his absence. If he had not, the magistrate could have reset the hearing for another day. Further, the magistrate did not err in the first place in conducting the hearing without Johnson—with or without his counsel's consent. The parties do not dispute that an accused person has a right to be present at every critical stage of a criminal proceeding against him and that a pretrial suppression hearing is a critical stage. Fed.R.Crim.P. 43, which codifies and restates the governing law, provides in pertinent part as follows:

> (a) **Presence Required.** The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impanelling of the jury and the return of the verdict, and at imposition of sentence, except as otherwise provided by this rule.

Fed.R.Crim.P. 43(c)(3), however, in turn provides that a defendant's presence is *not* required "[a]t a conference or argument upon a question of law." The initial question of whether placing Johnson in each array was impermissibly suggestive was a question of law. At the time, the critical facts as to suggestiveness were undisputed, and no further factual inquiry was necessary. *See United States v. Smith*, 546 F.2d 1275, 1281 (5th Cir.1977). Because Johnson did not show that the identification procedures he challenged were impermissibly suggestive, the magistrate did not need to reach what would have been the next question of whether there was a "very substantial likelihood of irreparable misidentification." *See Smith, supra*, 546 F.2d at 1279; *United States v. Briggs*, 700 F.2d 408, 412 (7th Cir.), *cert. denied*, 462

U.S. 1110, 103 S.Ct. 2463, 77 L.Ed.2d 1340 (1983). As the district court correctly held, the issue at the suppression hearing could not have been affected by Johnson's presence, except for the admittedly conjectural possibility that Johnson would have revealed to his lawyer the published photographs. Johnson's counsel never explains why he could not talk to his client to receive his input in advance of the hearing and Johnson never alleges or avers that he knew about the published photographs. Unsupported conjecture is not enough to make reversible error out of the magistrate's going forward without Johnson, especially given that the published photographs evidence would still have had to have been made the basis of a motion, with concomitant advance notice to the government. Indeed, at the hearing before the district court, defense counsel acknowledged that "the magistrate was correct in ruling ... [that] at that point my client's presence was not needed."

Johnson, however, now asserts that he would have been able to show suggestiveness had he been able to present the published photographs evidence. Even if Johnson would not have been the source of the published photographs evidence, the government for now does not challenge that the information about the television show and the bank posting was unknown to either side until after the first hearing. For purposes of deciding this appeal we assume that Johnson was unable to present the published photographs evidence through no fault of his own, and thus that the court properly entertained the new motion. *See United States v. Cranson,* 453 F.2d 123, 125–26 (4th Cir.1971), *cert. denied,* 406 U.S. 909, 92 S.Ct. 1607, 31 L.Ed. 2d 821 (1972).

The court correctly denied the renewed motion. First, if a teller had consciously remembered seeing either the television show or the bank display, then this would still not mean as a matter of law that Johnson could meet his burden of proving that the identification procedure used was impermissibly suggestive. In *United States v. Sebetich,* 776 F.2d 412 (3d

Cir.1985), *cert. denied,* —— U.S. ——, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988), the passenger in a getaway vehicle shot a police officer. During the course of the chase, the passenger leaned out the window (to fire) nine times. More than 18 months later, the officer noticed the passenger's photograph on the police station's bulletin board and spontaneously identified it as being of the man who had shot him. A few months later, an FBI agent showed the officer a photo spread containing the very photo that the officer saw on the bulletin board, and the officer once again identified the photo as that of the man who had shot him. The Third Circuit held that the out-of-court identifications were not impermissibly suggestive:

> An inspection of the spread confirms that it was a fair one containing men of similar age and appearance. [The officer], faced with a number of similar photographs, might have qualified his earlier identification.... Inasmuch as the spread contained this photograph, it could be argued to the trier of fact that it has little independent probative value, but the second identification was not thereby tainted by the first.

776 F.2d at 418. Johnson, however, did not challenge the government's claim that the tellers did not remember seeing his picture earlier. Rather, he suggests that a robbery victim could first closely observe the robber, then, second, forget what the robber looked like, then, third, identify a photo several months later because it happens to match a photo published in a setting that the victim does not recall seeing.

Johnson did not submit below or on appeal any caselaw or scientific support for his imaginative proposition. Thus, at the very least we cannot hold that this is the rare case in which "the procedures leading to an eyewitness identification may be so defective as to make the identification constitutionally inadmissible as a matter of law." *Foster v. California,* 394 U.S. 440, 442 n. 2, 89 S.Ct. 1127, 1128 n. 2, 22 L.Ed. 2d 402 (1969). The published photographs evidence only concerns the display of a photograph which was then presented in the *second* photo array. But the tellers

had already identified Johnson, though not as positively, in the *first* photo array; the second photo array was a superfluous confirmation of an unchallenged reliable first identification. The tellers had a good opportunity to observe Johnson during the robbery. They paid close attention to him for almost two minutes. It was based upon their observations at that time that they were able to identify him at trial (as well as to select his photo from at least the first array). The arrays were fair and featured people that looked alike.

■ Johnson also argues that it is somehow unconstitutional for the police to use in an identification procedure a photograph that they themselves had earlier distributed publicly. We disagree, and are not surprised that Johnson cites no authority for this proposition. Merely to create a risk that a witness may see a publicly distributed photo does not automatically create a substantial likelihood of subsequent irreparable misidentification.

■ It is the "reliability of identification evidence that primarily determines its admissibility." *Watkins v. Sowders*, 449 U.S. 341, 347, 101 S.Ct. 654, 658, 66 L.Ed.2d 549 (1981). It is the jury, in turn, that determines reliability. *Id.* (determining reliability "is the very task our system must assume juries can perform."). As the Court pointedly noted in *Watkins*, "the only duty of a jury in cases in which identification evidence has been admitted will often be to assess the reliability of that evidence." *Id.* Here, there was no substantial likelihood of irreparable misidentification. Therefore, the court properly instructed the jury to consider the reliability of the eyewitness identifications in light of the government's burden to prove beyond a reasonable doubt that Johnson was the robber. *See United States v. Schultz*, 698 F.2d 365, 368 (8th Cir.1983).

We recognize that Johnson's counsel would have prejudiced his client's defense by asking the tellers in front of the jury whether they had seen Johnson's mug shot elsewhere in connection with other crimes. But due process does not require "the abandonment of the time-honored process of cross-examination as the device best suited to determine the trustworthiness of testimonial evidence." *Watkins*, 449 U.S. at 349, 101 S.Ct. at 659. Johnson's counsel was still able to vigorously cross-examine the tellers about when they saw Johnson. For example, on cross-examination, Komans testified that she saw some photographs—none featuring the defendants—on the day after the robbery. The following cross-examination from Johnson's counsel ensued:

QUESTION: After that when was the next time that you saw someone who was similar to the suspect you have identified as my client either in photographic form, lineup form or any other way?

ANSWER: Probably some day when I was speaking with Agent Craft about photographs. I don't know what the date was in May.

QUESTION: Okay. The next time you saw someone that at least tested your recall of that particular suspect was when you saw the photos of my client, isn't this correct, in May of '87?

ANSWER: Correct.

QUESTION: Some seven months after the incident?

ANSWER: Correct.

At trial, when counsel had the published photographs evidence before him, he decided to emphasize the length of time between the date of the robbery and the time the tellers first saw Johnson's photo. Johnson's counsel did not request that the government present the foundation for the identification testimony outside the jury's presence. In addition, while defense counsel would understandably be reluctant to mention that the published photographs were connected to another crime, he could have asked the tellers whether they had seen Johnson's mug shot on television or in another bank. What mentioning the published photographs would say to the jury—assuming that it was not mentioned that they were in connection with another crime—is that the government thinks that Johnson committed a crime. But the jury knows this already from the fact that the

government has initiated prosecution. A stipulation or motion in limine could have prevented the government from mentioning other crimes, so the tellers could have been specifically asked about the published photographs. In any event, the court gave Johnson's counsel every opportunity to probe the identification evidence's reliability by vigorously cross-examining the tellers about their opportunities to view Johnson's photo.

 Finally, the district court did not abuse its discretion in denying Johnson's motion for severance. "Establishing actual prejudice from a joint trial means that the defendant could not have a fair trial without severance...." *United States v. Peters*, 791 F.2d 1270, 1301 (7th Cir.), *cert. denied*, 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986). Johnson asserted that there was a significant qualitative and quantitative difference in the evidence against him and the other co-defendants, and this greater evidence spilled over against him. We have reviewed the record and conclude that Johnson had a fair trial. The court instructed the jury that it was to separately consider the evidence against each defendant and to decide each individual case against each defendant on the basis of that evidence. *See Peters*, 791 F.2d at 1302–03. Further, this was an especially easy case for the jury to compartmentalize the evidence against each defendant. *See, e.g., Willard v. Pearson*, 823 F.2d 1141, 1149–50 (7th Cir.1987). As the district court stated before trial:

> The evidence presented in an affidavit accompanying the motion for severance does not establish a "gross disparity" as to the weight of the identification evidence. Defendant Johnson was identified in two photographic arrays, but not in a lineup. Defendant Gill was identified in a bank surveillance photo, but not in a photographic array. Defendant Nolan was identified in a lineup....

> The Court does not find "gross disparity" in this evidence. Nor does the Court find this evidence may unduly confuse the jury as to the strengths of the identifications.

We thus find no prejudice to Johnson in the joint trial. *See United States v. Davis*, 838 F.2d 909, 916 (7th Cir.1988).

Johnson's conviction is

**AFFIRMED.**