139 F.3d 902
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Timothy D. SCOTT, Defendant-Appellant.
 No. 97-2048.
 United States Court of Appeals, Seventh Circuit.
 Argued Nov. 3, 1997.
Decided Feb. 12, 1998.
 
 Appeal from the United States District Court for the Eastern District of Wisconsin. No. 96 CR 208.
 Before CUDAHY, EASTERBROOK, and EVANS, Circuit Judges.
 
 ORDER
 
 1
 The defendant appeals from a judgment of conviction of possession with intent to distribute in excess of 500 grams of cocaine. The supposed errors were denying a motion to suppress evidence obtained during a warrantless search, and sending a statement by the defendant into the jury room. The evidence is also said to be inadequate. The relevant evidence amounts to this. The date was September 24, 1996. Four Milwaukee police detectives, dressed in civilian attire, were trailing one Julian Holmes, their interest piqued by a tip he would be delivering a great deal of cocaine. Around 7:45 that evening, Holmes stopped his car in front of a duplex in Milwaukee. He got out of the car and walked up to the front door of the duplex, a bag slung over his shoulder. Holmes was let in the front door. About five minutes later, he came out that door, got in his car and drove off. The police followed Holmes for a while and then returned to the duplex. The police were walking down the sidewalk about two houses down from the duplex when they saw the defendant and another man, Timothy Davis, go out the front door. It appeared to the police that the defendant had a gun in his right hand. Spotting the group of four men walking toward them, Scott and Davis hurried back inside and shut the front door.
 
 
 2
 The police surrounded the duplex. Detectives Patrick Mitchell and Victor Beecher rang the front doorbells for the upper and lower units. Mary Jo Brown, who along with her husband, Milwaukee police officer Ronald Brown, owned the duplex and occupied the lower unit, opened the front door. The detectives explained that they were investigating a narcotics complaint and had just seen two men rush inside the duplex. Mrs. Brown then allowed the detectives into her unit.
 
 
 3
 Detective Mitchell asked Mrs. Brown if anyone had run into the house. She said yes, indicating the upper unit by pointing to the ceiling. Detective Mitchell then asked her if she had heard anyone go down the stairs to the basement. She said she had, and when Detective Mitchell requested permission to search the basement, she asked him to "search the complete basement." Detective Mitchell also asked for and received permission to be in the other "common areas" of the duplex-the duplex's front door and front entryway, with doors to the upper and lower units; the duplex's rear door and rear hallway, including stairs leading up to the rear entrance to the upper unit and down to the shared basement-and to go through the lower unit of the duplex to reach the rear hallway.
 
 
 4
 Detectives Mitchell and Beecher then went through the lower unit to the common rear hallway, took a quick look in the basement, and, after determining that no one was hiding there, went up two flights of common stairs to the rear interior door of the upper unit. The detectives knocked on the door and spoke to a man through the door. The detectives told the man that they had seen someone with a handgun and needed to come inside to make sure that no one was being threatened. When they were told they could not enter, the detectives threatened to kick the door down. When uniformed officers arrived on the scene, the defendant opened the door. The police entered and handcuffed the three men in the upper unit: Scott, Davis and Eric Cunningham. The officers looked around and found a toy gun, which the defendant revealed was the gun he had been seen carrying.
 
 
 5
 At this point, Detective Mitchell returned to the basement to see if anything had been hidden there, while other officers continued to search the upper unit. Wooden paneling bisects the basement. According to the upper unit's lease, the basement is shared by the upper and lower units, with one side for the use of the upper unit and the other side for the lower unit. The basement stairs end within the upper unit's side of the basement. Straight ahead, beyond the paneling, is the lower unit's side, the site of the duplex's furnace and its water heaters. To the left of the stairs, within the upper unit's half, are the common washer and dryer. Coming down the stairs, Detective Mitchell turned right and walked over to a pile of boxes for stereo equipment piled along the wall on the upper unit's side. One of the boxes was open. It could be seen to contain a closed brown paper bag and a clear plastic bag containing cocaine. Detective Mitchell opened the paper bag and found more cocaine. He conducted a field test which indicated that substance was cocaine. The only fingerprints found on the bags were those of Detective Mitchell. By this time, the officers had been in the duplex 10 to 15 minutes. Meanwhile, back in the upper unit, the other detectives discovered various items used for packaging cocaine.
 
 
 6
 Scott, Davis and Cunningham were arrested and taken to the police administration building. At 1:40 the next morning, September 25, 1996, in a windowless, 8 by 12 foot room, Detective James Bizub interviewed Scott. The detective began the interview by reading from a wallet-sized card labeled "constitutional rights."* The defendant stated that he understood what had been read to him and that he was willing to speak with Detective Bizub. During the interview, the detective wrote down a statement made by the defendant. As the detective was writing down the statement, he would ask questions of the defendant. Occasionally the defendant would make corrections as Detective Bizub was writing.
 
 
 7
 In his statement Scott said, among other things, that his girlfriend Nichelle Crawley lived in the upper unit of the duplex with her two children and her brother. Scott spent two or three days a week there, and kept some clothing in the apartment. He saw an individual bring the cocaine into the apartment that day. Scott said he would identify the individual if allowed to talk to Eric Cunningham for a few minutes.
 
 
 8
 At 4:14 that morning, Cunningham was brought in and spoke with Scott. Scott and Cunningham stated that they wanted a guarantee that they would not be charged in connection with the cocaine. The police said they could not provide a guarantee. Eric Cunningham was taken out of the interview room at 4:20 a.m., and Scott declined to identify the individual who brought the cocaine. At the end of the interview, the detective read the statement to the defendant and the defendant signed it.
 
 
 9
 The defendant was subsequently indicted on the charge of possession with intent to distribute in excess of 500 grams of cocaine and in excess of 50 grams of cocaine base, violating 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Scott moved to suppress his statement of September 25, 1996, and suppress evidence seized in the search of the duplex on September 24, 1996. He also moved for dismissal of the case for lack of probable cause to support his warrantless arrest.
 
 
 10
 Under the authority of 28 U.S.C. § 636(b)(1), Magistrate Judge Gorence held an evidentiary hearing and submitted proposed findings of fact and recommendations for the disposition of the motions to the district court. The Magistrate Judge recommended that the district court grant Scott's motion to suppress evidence seized from the living quarters of the upper unit, but deny his motions to suppress his statement and the evidence from the search of the basement. The Magistrate Judge also noted that written objections to the recommendations could be filed with the district court within ten days of service of the recommendation, and that failure to file a timely objection with the district court would waive the right to appeal. The recommendation was filed on November 29, 1996. No such written objections were filed.
 
 
 11
 On December 30, 1996, the district court conducted the final pretrial hearing. At that time, Scott's lawyer indicated that Scott had an untimely objection to the recommendation. Scott's lawyer explained that there had been "a conflict of opinion as to the case law and the finding by the Magistrate Judge between myself and Mr. Scott. Mr. Scott does wish for me to bring objection as to those things found in the basement and I guess under that situation I should follow through on my client's desire." 4 Tr. 5. Scott's lawyer explained that the defendant's objections were limited
 
 
 12
 to the evidence found in the basement. There is, there was significant testimony about what portions of the basement found or belonged to the upper unit and felt that that belonged to the lower unit. And also that the, the police officers in this case, Judge, proceeded with a search of the basement after already completing the protective sweep and there could be an issue of whether or not the consent to the initial search by the landlord, while that was likely proper, there's an issue I guess of whether or not that consent lapsed and whether or not the need for a further search based upon what was found but ultimately suppressed in the upper flat was valid at that point.
 
 
 13
 Id. at 5-6. Scott's lawyer represented that the factual findings of the Magistrate Judge were not contested. The district judge then inquired whether "it is your intention to file your objection in accordance with Rule 11?" Scott's lawyer responded, "Yes, Judge." The district judge then stated
 
 
 14
 All right. I will entertain it. However, at this juncture I do not have anything before me. I will issue my decision today based upon the documents, I should say based upon the Magistrate Judge's recommendation and the absence of timely objection. Should an untimely motion be filed I'll dispose of that based upon what has been represented to the Court today and will proceed accordingly.
 
 
 15
 Id. at 7. According to the record, no written motion objecting to the recommendations was ever filed. The district court adopted the Magistrate Judge's recommendations in full.
 
 
 16
 A three-day trial began on January 6, 1997. Mary Jo Brown and Officer Ronald Brown both testified that neither the cocaine nor the stereo boxes in which it was found belonged to them. The defendant did not testify, but portions of his written statement were read to the jury during the testimony of Detective Bizub.
 
 
 17
 Jury deliberations began on January 8 at 12:50 in the afternoon. In the course of the deliberations, the jury sent the court a note. Signed by the foreperson, it read, "We would like to see a copy of Mr. Scott's interview statement." Over the objection of the defendant, at 3:15 p.m. the court provided the jury with all of the exhibits except the cocaine. The jury was provided with a redacted version of Scott's statement. One paragraph on the first page of the statement, indicating that Scott was on probation for carrying a concealed weapon, had not been read to the jury. The redaction was apparently accomplished by cutting out the paragraph following the excluded one and placing it over the excluded portion of the statement, and then photocopying the modified document. Thus there is a noticeable but not pronounced discontinuity in the middle of the first page, and the text on the first page ends about three-quarters of the way down the page. On each of the following three pages, text takes up the entire page. At 3:30 p.m. the jury ended its deliberations after agreeing on a verdict of guilty.
 
 
 18
 After the trial, the defendant moved for a judgment for acquittal notwithstanding the verdict, which the district court denied. The court sentenced Scott to pay a fine of $2,000 and a $100 special assessment, and to imprisonment for 98 months, followed by supervised release for 5 years. Scott filed a timely notice of appeal.
 
 I. Motion to suppress evidence
 
 19
 In this case, the admissibility of the cocaine found in the basement turns on whether Mrs. Brown possessed the authority to consent to the search of the open stereo box. See United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); United States v. Saadeh, 61 F.3d 510, 517 (7th Cir.1995). It is enough that the police reasonably believed that she had the authority. See Illinois v. Rodriguez, 497 U.S. 177, 186, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). Scott contends that Mrs. Brown lacked the authority to consent to a search of the inside of the box because the box was located in a part of the basement designated in the lease as belonging to the tenants in the upper unit. Scott also argues that since the police had already made an initial search of the basement and determined that no one was hiding there, they were required to attempt to determine the scope of Mrs. Brown's common authority more precisely before returning to the basement.
 
 
 20
 We first address a point of procedure. Both parties inform us that the district court accepted Scott's untimely oral objection to a portion of the Magistrate Judge's recommendations. It is not clear, however, that the district court did accept Scott's objection, or in fact that Scott even made a proper objection. Although under the rules of criminal procedure a district court may allow oral motions, see Fed.R.Crim.P. 12(b), the more plausible reading of the district court's remarks at the final evidentiary hearing is that the district court expected Scott to follow up on his oral objection by filing a written one. Section 636(b)(1) of Title 28 calls for written objections to the Magistrate Judge's recommendations, and while a district court can presumably allow oral objections, here it is not sufficiently clear that the district court did so. It is also unclear from the district court's written order adopting the Magistrate Judge's recommendations that the district court accepted Scott's untimely objection. If Scott did not properly object to the recommendations, he waived his right to appeal their adoption by the district court. See United States v. Johnson, 859 F.2d 1289, 1294 (7th Cir.1988). This waiver rule, however, is not jurisdictional, see Thomas v. Arn, 474 U.S. 140, 146, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), and since the government does not rely on it, neither will we. See United States v. Anaya, 32 F.3d 308, 312 (7th Cir.1994).
 
 
 21
 In this case, it was reasonable for the police to conclude that the basement was used by the upper and lower units of the duplex "in common and under the control of the landlord," Mrs. Brown, United States v. Kellerman, 431 F.2d 319, 321 (2d Cir.1970). There was free access to the basement from the common hallway, and although wooden paneling separated the areas used by the upper and lower units, the duplex's washer and dryer were located on the upper unit's side. The basement stairs ended well within the upper unit's side, so that access to the lower unit's side of the basement required passing through the upper unit's side. There were several open passages, without doors, through the wooden divider. Under these circumstances, the police could believe in good faith that Scott had no reasonable expectation of privacy with respect to the portion of the basement used by the upper unit. See United States v. Cook, 530 F.2d 145, 148-49 (7th Cir.1976).
 
 
 22
 Nothing about the situation suggested the need for further inquiry by the police about the basement before they returned there within 10 to 15 minutes, without ever having left the duplex. Although the first time the police went down to the basement, it was to look for persons who might be hiding, the police told Mrs. Brown at the outset that they were investigating a narcotics complaint, so the scope of her consent extended beyond the initial sweep for concealed persons. Scott does not claim that upon encountering him in the upper unit the police were required to seek his permission before searching the basement further. See United States v. Sumlin, 567 F.2d 684, 687-88 (6th Cir.1977); United States v. Hendrix, 595 F.2d 883, 885 (D.C.Cir.1979). Thus the police were lawfully in a position to seize the cocaine in plain view within the open box. See Minnesota v. Dickerson, 508 U.S. 366, 374-75, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); United States v. Kelly, 551 F.2d 760, 763 (8th Cir.1977). Scott does not distinguish between the cocaine in plain view and the cocaine in the closed paper bag, so we do not consider whether there is any relevant distinction. See United States v. Ladell, 127 F.3d 622, 624 (7th Cir.1997); cf. Florida v. Jimeno, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1990). On the basis of the unchallenged factual findings below and our independent review of the legality of the search, see Ladell, 127 F.3d at 124, the cocaine was properly admitted.
 
 II. Scott's statement
 
 23
 Scott contends that under the circumstances of the trial, the jury's request to review his redacted statement should have been denied. Scott notes that the evidentiary segment of his trial occurred on a single day, that the trial judge did not allow the jurors to take notes, and that Scott did not testify. He also suggests that the manner of redacting the statement allowed the jury to speculate about what was excluded. He argues that the jury may have placed excessive weight on his statement, pointing to the fact that the jurors concluded their deliberations within 15 minutes of receiving the exhibits.
 
 
 24
 The trial court may, at its discretion, send exhibits into the jury room. United States v. Samples, 713 F.2d 298, 303 (7th Cir.1983). The role of appellate review is to insure that the district court's decision did not clearly prejudice the defendant. See United States v. De Hernandez, 745 F.2d 1305, 1308 (10th Cir .1984). At most, Scott's arguments address the risk of prejudice, and fall far short of establishing clear prejudice.
 
 
 25
 The trial transcript reveals that the district court considered Scott's arguments in light of the appropriate standard, and was "satisfied that no und[ue] prejudice, or any prejudice at all would result from sending to the jury the exhibits which were admitted either by the stipulation or otherwise." 6 Tr. 353. The district court also prudently sent all of the exhibits to the jury--except, at the defendant's request, the cocaine--"since sending the [statement] alone might have caused undue emphasis to be placed upon one exhibit in the case." United States v. Thomas, 521 F.2d 76, 82 (5th Cir.1975), overruled on other grounds by McLaughlin v. United States, 476 U.S. 16, 106 S.Ct. 1677, 90 L.Ed.2d 15 (1986). After Scott objected to the initial redacting of inadmissible material in his statement by blacking out one paragraph, the court had a second version prepared: the photocopy of the cut and paste procedure. Scott did not object to this revised manner of redacting the document or suggest any other means of eliminating the inadmissible material. We have examined both the original statement and the version provided to the jury, and are not convinced the version given to the jury invited prejudicial speculation about what was omitted.
 
 
 26
 Scott's claim that "[t]here is no question but that the jury made its decision based upon defendant's statement," Br. & App. of Appellant at 14, is based on the fact that the jury concluded its deliberations within 15 minutes of receiving his statement. But this does not mean it was prejudicial to send the statement into the jury room along with the other exhibits. The jury specifically requested the defendant's statement, suggesting that the jury already considered the statement to be significant. The jury could have based its decision on the defendant's statement with or without having the written version before them. In any event, the sequence of events does not show that the jury placed greater weight on the statement than on any of the other evidence.
 
 III. Sufficiency of the evidence
 
 27
 The defendant argues that the evidence is inadequate to show that he possessed the cocaine found in the basement. From the testimony at trial, however, a rational jury could conclude that Scott was a resident of the duplex, had free access to the basement location where the cocaine was discovered, knew of the presence of the cocaine, knew of the source of the cocaine, witnessed the source bring the cocaine into the house, and was present at the time the cocaine was discovered. A rational jury could also conclude that neither Ronald Brown nor Mary Jo Brown knew about the cocaine, so that Scott was the only resident of the duplex who both knew about the cocaine and was present at the time it was discovered by the police. Therefore, although Scott was not the only resident of the duplex, the evidence sufficiently distinguished Scott as having "dominion, ownership, or control of the cocaine," United States v. Jackson, 51 F.3d 646, 655 (7th Cir.1995). See United States v.. Walker, 99 F.3d 439, 431 (D.C.Cir.1996); United States v. Thorne, 997 F.2d 1504, 1512 (D.C.Cir.1993); cf. United States v. DiNovo, 523 F.2d 197, 201-02 (7th Cir.1975) (holding residence and knowledge of contraband insufficient where wife of drug dealer not in immediate area where heroin discovered); Delgado v. United States, 327 F.2d 641, 642 (9th Cir.1964) (holding constructive possession requires evidence of knowledge in addition to occupancy); United States v. Megerson, 4 F.3d 337, 348 (5th Cir.1993) (collecting cases on requirements for constructive possession in jointly-occupied residence). Scott argues that his knowledge of the cocaine does not prove constructive possession, that his presence at the duplex does not prove constructive possession, etcetera. But while no one such factor may be sufficient, all the factors taken together are.
 
 
 28
 Scott also argues that the considerable amount of cocaine alone is inadequate to show an intent to distribute cocaine. Actually, it is. See United States v. Stribling, 94 F.3d 321, 325 (7th Cir.1996); United States v. Sanchez, 961 F.2d 1169 (5th Cir.1992). For each element of the offense, there was enough evidence to satisfy a rational jury of the defendant's guilt beyond a reasonable doubt. See United States v. Earnest, 129 F.3d 906, 913 (7th Cir.1997).
 
 
 29
 The judgment of conviction is AFFIRMED.
 
 
 
 *
 The "Advice of Rights" card read to the defendant contained the following language:
 You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to consult with a lawyer before questioning and to have a lawyer present with you during questioning. If you cannot afford to hire a lawyer, one will be appointed to represent you at public expense before or during any questioning, if you so wish. If you decide to answer questions now without a lawyer present, you have the right to stop the questioning and remain silent at any time you wish, and the right to ask for and have a lawyer at any time you wish, including during questioning.
 Ex. 19.